# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v BECK

Docket Nos. 160668 and 160669. Argued on application for leave to appeal October 6, 2021. Decided July 27, 2022.

James Beck was convicted, following a jury trial, in the Macomb Circuit Court of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b, and three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c. In 2016, defendant was charged with two counts of CSC-II related to allegations that he sexually assaulted his minor daughter, TG, and the case proceeded to a jury trial. During the jury's deliberations, one of the jurors notified the trial court that another juror might have done outside research on the case. The trial court polled the jury by written note to find out whether any of the jurors were aware of that research. Two of the jurors responded affirmatively: Juror 255 stated that he had not researched the case itself, but had asked his mother about "her past experience" without mentioning the case. Juror 337 told the court that he had heard that one of the jurors was "looking into another [in]discretion" that had occurred in the juror's family. The court discussed this information with the parties, and the prosecution asked the court to replace the two jurors with alternates, while defendant preferred to allow the seated jury to continue its deliberations or to further question the two jurors to obtain more information. The trial court rejected the parties' requests and determined that the entire jury was tainted and declared a mistrial. The case was set for retrial in 2017. In 2017, while awaiting retrial, defendant was accused of sexually assaulting CS, the minor friend of one of his children, and was charged with two counts of CSC-I and one count of CSC-II. One of the CSC-I counts was charged as "person under 13, defendant 17 years of age or older" under MCL 750.520b(2)(b), which mandates a minimum sentence of 25 years in prison. The other CSC-I count in the information did not cite MCL 750.520b(2)(b) and stated only that the victim was "under 13," without also alleging that defendant was 17 years old or older. The 2016 charges and the 2017 charges were jointly tried in a second trial, and defendant was found guilty of all charges. The court sentenced defendant to 25 to 60 years in prison for each count of CSC-I and 57 to 180 months in prison for each count of CSC-II. Defendant appealed, and the Court of Appeals, METER, P.J., and O'BRIEN and SWARTZLE, JJ., affirmed in an unpublished per curiam opinion. Defendant applied for leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant defendant's application for leave to appeal or take other action, instructing the parties to address whether defendant's second trial was barred by the Double Jeopardy Clauses of the state or federal Constitutions and whether the trial court had improperly

imposed a mandatory minimum sentence of 25 years for the count of CSC-I that was not charged as carrying this minimum sentence. 506 Mich 946 (2020).

In an opinion by Justice VIVIANO, joined by Chief Justice MCCORMACK and Justices BERNSTEIN and CLEMENT, the Supreme Court *held*:

The trial court did not conduct a sufficient inquiry to support a finding of manifest necessity before declaring a mistrial as to the 2016 charges; therefore, the court's declaration of a mistrial was an abuse of its discretion and the retrial on those charges violated double-jeopardy protections. Accordingly, defendant's convictions related to the 2016 charges had to be vacated. However, defendant was not entitled to a new trial, resentencing, or other relief regarding the 2017 charges. Contrary to defendant's contention that the remaining convictions were tainted by the admission of evidence related to the 2016 charges, his daughters' testimony would have been admissible other-acts evidence even if defendant had been tried separately on the 2017 charges. The trial court did commit plain error by imposing a mandatory minimum sentence of 25 years under MCL 750.520b(2)(b) for the second count of CSC-I charged in 2017, but resentencing was not necessary because the error did not affect the fundamental fairness of the trial.

1. Under both the state and federal Constitutions, an accused cannot be placed in jeopardy twice for the same offense. If a trial is concluded prematurely, a retrial for that offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of manifest necessity. Determining whether manifest necessity exists requires balancing the competing concerns of the defendant's interest in completing the trial in a single proceeding before a particular tribunal and the strength of the justification for a mistrial. Before declaring a mistrial, the trial court must consider whether a mistrial is appropriate on the record and discuss alternatives with defense counsel and the prosecutor. When the trial court does not follow these procedures, there is no manifest necessity for declaring a mistrial. In this case, the standard for declaring a mistrial was not satisfied. Although the trial court polled the jury and briefly discussed the matter with counsel, including each side's proposed alternatives, the court's consideration of the matter was too abrupt, and its conclusions were not supported by sufficient evidence. The nature of the juror's outside research was unclear to the court, but instead of further probing the juror's research and whether it would affect the proceedings, the court summarily declared a mistrial. Further, although the court learned when the jury was polled that only one other juror knew about the outside research, the court nonetheless concluded that the entire jury was tainted. The court did not find a justification for mistrial that outweighed defendant's interest in continuing the trial. Therefore, the court's inquiry was insufficient to find manifest necessity, and retrial on the 2016 charges violated the Double Jeopardy Clauses of the federal and state Constitutions.

2. Defendant argued that he was entitled to a new trial on the 2017 charges because his convictions on those counts were tainted by the admission of evidence related to the 2016 charges during the joint trial. At issue was whether the testimony of defendant's daughters and his ex-wife would have been inadmissible propensity evidence in a trial on only the 2017 charges. Propensity evidence is generally inadmissible under MRE 404(b)(1). However, MRE 404(b)(1) is superseded by MCL 768.27a when a criminal defendant is accused of committing a listed offense, including CSC-II and fourth-degree criminal sexual conduct (CSC-IV) against a minor. Under the statute, evidence that a defendant committed another listed offense against a minor is admissible and may

be considered for its bearing on any matter to which it is relevant. Therefore, evidence that defendant committed CSC-II or CSC-IV was admissible under MCL 768.27a(1). The pertinent question then was whether the challenged testimony qualified as evidence of CSC-II or CSC-IV. The 2016 victim's testimony that defendant touched her breasts and her genitals over her clothing when she was between 10 and 12 years old satisfied the elements of CSC-II, and defendant's other daughters' testimony also represented evidence that defendant committed CSC-II or CSC-IV; accordingly, the challenged evidence was admissible under MCL 768.27a(1). However, evidence that is admissible under MCL 768.27a must also comply with MRE 403. Under MRE 403, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Considerations under MRE 403 may include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. When applying MRE 403 to evidence admissible under MCL 768.27a, courts must weigh the propensity inference in favor of the probative value of the evidence rather than its prejudicial effect. In this case, the analysis would have weighed in favor of admitting the evidence. TG and defendant's other daughters alleged that defendant engaged in acts generally similar to those alleged by CS, many of the acts were temporally proximate, no intervening acts occurred, and there was a need for additional evidence to support CS's allegations. In sum, the probative value of the other-acts testimony was not outweighed by unfair prejudice. With regard to the testimony of defendant's ex-wife, defendant's arguments were made in conclusory fashion and the Court did not address them.

3. Under MCL 750.520b(2)(b), when CSC-I is committed by a person aged 17 years or older against a person under the age of 13, the offense carries a mandatory minimum sentence of 25 years. In this case, the trial court imposed a mandatory minimum sentence of 25 years for both of defendant's remaining convictions for CSC-I, despite the fact that the information only stated that one of the CSC-I charges carried that sentence. Under the Sixth Amendment, a criminal defendant has the right to be informed of the nature and cause of the accusation against them. A constitutionally sufficient charging document contains the elements of the offense charged and fairly informs the defendant of the charge against which the defendant must defend. The elements of an offense include those facts that increase both the ceiling and the floor of the punishment for an offense; this includes facts that increase the mandatory minimum sentence of an offense. In *Alleyne v United States*, 570 US 99 (2013), the Court held that if a statute prescribed a particular punishment to be inflicted on those who violated the statute under special circumstances mentioned in the statute, those special circumstances must be specified in the indictment. This requirement is meant to allow the defendant to predict the legally applicable penalty from the face of the indictment. Under MCL 750.520b(2)(b), the defendant must be 17 years of age or older for the 25-year mandatory minimum sentence to apply. Accordingly, this fact increases the minimum penalty of the crime and is therefore an element that must be charged. Because only one of the remaining CSC-I counts against defendant charged him as a person 17 years of age or older, the trial court's decision to apply the mandatory minimum to both counts was plainly in error. However, the error did not significantly affect the fairness of the trial. Defendant had notice that he was over the age of 17 when he committed both counts of CSC-I; both counts arose out of defendant's actions on a particular date, so he was necessarily the same age when the conduct underlying both charges occurred; and the jury found beyond a reasonable doubt that defendant

was over 17 years old at the time of the offenses. Additionally, the information's statement of the required ages of the victim and the offender as to the first count of CSC-I put defendant on notice that he would potentially be subjected to the same mandatory minimum for the second count. Therefore, this error did not entitle defendant to resentencing because it did not result in an unfair trial.

Convictions stemming from the 2016 charges vacated; convictions and sentences stemming from the 2017 charges affirmed.

Justice ZAHRA, concurring in part and dissenting in part, agreed that defendant was not entitled to relief related to the 2017 charges and convictions but disagreed with the majority's decision to vacate defendant's convictions relative to the 2016 charges and opined that the majority had failed to give adequate deference to the trial court's decision to declare a mistrial. Justice ZAHRA noted that manifest necessity is not to be interpreted literally or applied mechanically; rather, a high degree of necessity is required to justify declaring a mistrial. The level of appellate scrutiny properly applied to a trial court's decision depended on the nature of the circumstances that led to the mistrial declaration. In a case of possible jury bias, the decision of the trial judge was entitled to special respect, given the judge's opportunity to observe the sequence of events in the context of the trial. Under MCR 6.417, the trial court, before ordering a mistrial, must give the parties an opportunity to comment on the record on the propriety of the order, to state whether they consent or object, and to suggest alternatives. The role of the appellate court was not to determine whether it would have found manifest necessity, but whether the trial court abused its discretion. Justice ZAHRA opined that the trial court in this case did not abuse its discretion by declaring a mistrial. The record showed that the court complied with its obligation under the court rule and acted deliberately and responsibly in declaring a mistrial. Further, a review of the whole record demonstrated that extraneous information was brought into the jury room and created the possibility of juror bias sufficient to support a finding of manifest necessity to warrant a mistrial. Justice ZAHRA also was not convinced that the trial court had to extensively consider less drastic alternatives, noting that this was not required under either caselaw or the court rules, and in any event, the trial court's consideration of the parties' proposed alternatives was adequate.

Justice CAVANAGH, joined by Justice WELCH, concurring in part and dissenting in part, agreed with the majority opinion that the trial court had abused its discretion in finding that a manifest necessity required a mistrial and that consequently, defendant's second trial on the 2016 charges violated the prohibition against double jeopardy. However, Justice CAVANAGH would have remanded the case to the Court of Appeals to consider whether the 2017 convictions were impermissibly tainted by the introduction of the 2016 charges and additional other-acts evidence. Justice CAVANAGH also stated that the majority opinion had failed to faithfully conduct the analysis set forth in *People v Watkins*, 491 Mich 450 (2012), regarding whether evidence introduced pursuant to MCL 768.27a was admissible under MRE 403. Justice CAVANAGH noted that while *Watkins* required the courts to separately review each act alleged under MRE 403, the majority opinion lumped all the other-acts evidence together into one conclusory analysis and was therefore unclear as to whether some of the evidence admitted under MCL 768.27a should have been admitted under MRE 403.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 27, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

      Nos. 160668-9

JAMES BECK,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

VIVIANO, J.

Defendant's first trial ended when the trial court declared a mistrial. While awaiting retrial, defendant was charged with additional crimes, which were tried jointly with his original charges in a second trial. Three issues are presented in this appeal. First, whether the retrial of defendant's original charges was barred by the Double Jeopardy Clause of the federal or state Constitution. See US Const, Am V; Const 1963, art 1, § 15. Second, if the retrial of the original charges was barred, whether vacating those convictions would entitle

defendant to any relief with respect to his remaining convictions. Third, whether the trial court erred by imposing a mandatory minimum sentence of 25 years for defendant's conviction of first-degree criminal sexual conduct (CSC-I) when the information did not state that the charge carried this minimum sentence.

We hold that the trial court abused its discretion by declaring a mistrial in the initial trial without conducting an inquiry sufficient to support a finding of manifest necessity. As a consequence, those convictions will be vacated. However, defendant has not demonstrated that he is entitled to a new trial, resentencing, or other relief regarding the other convictions. Finally, we hold that the trial court committed plain error by imposing a mandatory minimum sentence of 25 years under MCL 750.520b(2)(b) because the age requirement is an element that must be charged in the information and found by the jury, and it was not charged here. However, defendant is not entitled to relief because this error did not result in a fundamentally unfair trial.

## I. FACTS

In 2016, defendant, James Beck, was charged with two counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c, for allegedly rubbing his underage daughter TG's genitals and chest through her clothing while he was alone with her. At the end of the trial, the jury began to deliberate. However, during deliberations, a juror informed the judge that another juror may have done outside research on the case. The trial judge, concerned about juror bias, polled the jury by written note to see if any of the jurors knew of that research. All but two jurors responded in the negative. Juror 255 said he "didn't do any research on the case itself," but "[w]ithout mentioning anything about

2

the case, I asked my mom about her past experience." Juror 337 said that what he had heard "was not about the case, but [that] a juror was looking into another discretion [sic] within his family."

The court then spoke to the parties about the issue. The prosecution wanted these two jurors replaced with alternates. Defendant, however, wanted the jury to either continue its deliberations or further questioning of Jurors 255 and 337 to obtain more information. Defendant also argued that there was not enough information to show manifest necessity for a mistrial. The trial judge, however, expressed concern that the entire jury was tainted beyond repair because she did not know the subject of Juror 255's inquiry and speculated that the entire jury must know about it if Juror 337 had overheard something. Therefore, the trial court rejected the parties' requests and declared a mistrial. The case was set for retrial in 2017.

In 2017, while awaiting retrial on the original charges, defendant was accused of sexually penetrating one of his son's friends, CS, who was a minor. As a result, defendant was charged with two counts of CSC-I and one count of CSC-II. The first count of CSC-I resulting from this incident was charged as "Person Under 13, Defendant 17 years of age or older" under MCL 750.520b(2)(b), which mandates a minimum sentence of 25 years' imprisonment. However, the other CSC-I count only charged that the victim was "U[nder] 13" and did not allege that defendant was 17 years old or older or cite MCL 750.520b(2)(b).

The new charges and the original charges were jointly tried in a second trial. TG and CS both testified about their respective allegations. TG testified about three separate incidents. In 2013, she was sitting on the defendant's lap while he used the computer in his trailer. He opened her knees and rubbed her genital area through her sweatpants twice.

3

She was 10 years old at the time. Sometime after, while defendant was throwing kids into a swimming pool, he reached his hands into her swimsuit when gripping her hips. And in 2015, when she was 12 years old, he asked her to sit on the couch with him when the other kids in the trailer were asleep. He tickled her, put his hands up her shirt, and touched her breasts.

CS, who is not related to the defendant, testified that in February 2017, when she was 12 years old, she went to the defendant's trailer to see his son, CB. The defendant gave CB a bottle of fireball whiskey for his birthday, and CS, CB, and other friends drank it and danced in CB's bedroom. While they were dancing, the defendant came in and started dancing with CS, putting his hands on her hips. When the other kids went for a walk, CS stayed behind, too drunk to walk. The defendant picked her up, took her to his bed, and pulled down her pants and underwear. He tried to penetrate her with his penis after she told him to stop. She vomited, ran to the bathroom, and continued vomiting into the toilet. While she was vomiting, the defendant attempted to penetrate her again.

In addition, over defendant's objection, three of defendant's other daughters and his ex-wife were permitted to testify about their interactions with defendant. One of his daughters, AR, testified that in 2007 when she was 15 and 16, defendant came into her room regularly to rub her back and touch her genitals. Another daughter, ANB, testified that defendant watched her and her friends change their clothing in 2014 when she was 16 years old; went into the bathroom while she showered in 2011 to 2013 when she was 13 to 15; and once rubbed her "inner upper thigh" and kissed her on the lips. Defendant's third daughter, ADB, testified that he slapped her on the buttocks and placed her toes in his

4

mouth. Defendant's ex-wife testified that defendant treated the children in a cruel manner and sought custody only so that he could receive child-support payments.

At the conclusion of the second trial, the jury found defendant guilty of all counts. The court sentenced him to 25 to 60 years for each count of CSC-I, 57 to 180 months for each count of CSC-II, and ordered the CSC-II sentences to be served concurrently with the CSC-I sentences. Defendant appealed his convictions and sentences in the Court of Appeals, which affirmed them in an unpublished opinion. Defendant then sought leave to appeal in this Court. We granted oral argument on the application for leave to appeal with regard to the following issues:

> (1) whether the defendant's retrial in Docket No. 2016-000309-FH was barred by the Double Jeopardy Clauses of the federal or state constitutions, US Const, Am V; Const 1963, art 1, § 15; (2) if so, whether vacating his convictions in that case would also warrant a new trial, resentencing, or any other remedy in the jointly tried case, Docket No. 2017-001376-FC; and (3) whether the trial court improperly imposed a mandatory minimum sentence of 25 years for an act of first-degree criminal sexual conduct (Count II) that was not charged as carrying such a minimum. See *Alleyne v United States*, 570 US 99, 109-111[; 133 S Ct 2151; 186 L Ed 2d 314] (2013); *Apprendi v New Jersey*, 530 US 466, 476, 478-479[; 120 S Ct 2348; 147 L Ed 2d 435] (2000) . . . . [*People v Beck*, 506 Mich 946 (2020).]

## II. ANALYSIS

## A. DOUBLE JEOPARDY

The first issue is whether the retrial on defendant's original charges was barred by the Double Jeopardy Clauses of the federal and state Constitutions. See US Const, Am V; Const 1963, art 1, § 15.[1] "Under both the Michigan and the federal constitutions, an

___

[1] *Benton v Maryland*, 395 US 784, 794; 89 S Ct 2056; 23 L Ed 2d 707 (1969) ("[W]e today find that the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the

accused cannot be placed in jeopardy twice for the same offense." *People v Hicks*, 447 Mich 819, 826; 528 NW 2d 136 (1994), citing Const 1963, art 1, § 15; US Const, Am V. This protection attaches " 'once the defendant is put to trial before the trier of fact, whether [it] be a jury or a judge.' " *Hicks*, 447 Mich at 826, quoting *United States v Jorn*, 400 US 470, 479; 91 S Ct 547; 27 L Ed 2d 543 (1971) (alteration in original). When the trier of fact is a jury, "jeopardy generally attaches at the time the jury is selected and sworn." *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). "If the trial is concluded prematurely, a retrial for that offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of a manifest necessity." *Mehall*, 454 Mich at 4. It is the prosecutor's "heavy" burden to show manifest necessity. *Arizona v Washington*, 434 US 497, 505; 98 S Ct 824; 54 L Ed 2d 717 (1978).

In deciding whether manifest necessity exists, the United States Supreme Court has stated:

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious

---

Fourteenth Amendment."). While we are not bound to interpret our Constitution consistently with similar provisions of the United States Constitution, "we have been persuaded in the past that interpretations of the Double Jeopardy Clause of the Fifth Amendment have accurately conveyed the meaning of Const 1963, art 1, § 15." *People v Smith*, 478 Mich 292, 302 n 7; 733 NW 2d 351 (2007). Therefore, our analysis is the same under each.

causes . . . ." [*Hicks*, 447 Mich at 828, quoting *United States v Perez*, 22 US (9 Wheat) 579, 580; 6 L Ed 165 (1824).]

"Determining whether manifest necessity exists to justify the declaration of a mistrial requires a balancing of competing concerns: the defendant's interest in completing his trial in a single proceeding before a particular tribunal versus the strength of the justification for a mistrial." *Id*. at 829. We have stated that "[a] mistrial may only be declared . . . after an on the record consideration and discussion of alternatives with counsel." *People v Benton*, 402 Mich 47, 65; 260 NW2d 77 (1977); see also MCR 6.417 ("Before ordering a mistrial, the court must, on the record, give each defendant and the prosecutor an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives.").[2] To declare a mistrial, the trial court must find the facts justifying the mistrial.[3] When such procedures are not followed, there is no manifest necessity for declaring a mistrial. *Benton*, 402 Mich at 65.

---

[2] Although some of the federal caselaw cited in *Benton* has been overruled, this Court has never overruled *Benton* and no party has asked us to do so in the present case. See generally *People v Lett*, 466 Mich 206, 220, 221 n 13; 644 NW2d 743 (2002). In any event, even if consideration of alternatives is not constitutionally required, the trial court's failure to do so in the present case supports our conclusion that the trial court acted "precipitately" and without the "greatest caution" before declaring a mistrial. *Washington*, 434 US at 515; *Perez*, 9 Wheat at 580.

[3] *People v Parker*, 145 Mich 488, 500; 108 NW 999 (1906) ("Appellate courts will not interfere with the action of trial courts in discharging juries, where facts are found upon which such action can be based. But the facts must be found and placed upon the record."); *People v Anglin*, 6 Mich App 666, 674; 150 NW2d 532 (1967) ("In dealing with cases of alleged juror disqualification or misconduct discovered after the jury has been impaneled, our Supreme Court has pointed out that the trial judge who has conducted an investigation is better able to judge the question of disqualification because he 'saw and heard the juror and could note his appearance and attitude, tone of voice and manner of testifying when undergoing the investigation.' "), quoting *People v Schepps*, 231 Mich 260, 270; 203 NW 882 (1925).

"This Court accords considerable deference to a judge's determination of whether there is manifest necessity justifying declaration of a mistrial." *Id*. To ensure that the trial court properly exercised its discretion, the reviewing court must consider the "particular facts" of the case. *Hicks*, 447 Mich at 829. "[I]f a trial judge acts irrationally or irresponsibly, . . . his action cannot be condoned." *Arizona v Washington*, 434 US 497, 514; 98 S Ct 824; 54 L Ed 2d 717 (1978). See generally *Fulton v Moore*, 520 F3d 522, 529 (CA 6, 2008) (explaining that the court's review of "manifest necessity" focuses on "whether the trial judge (1) heard the opinions of the parties about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly"). The ultimate question is "not whether this Court would have found manifest necessity, but whether the trial court abused its discretion in finding manifest necessity." *People v Lett*, 466 Mich 206, 220; 644 NW2d 743 (2002) (emphasis omitted).

In this case, although the trial court may have believed it was acting with an abundance of caution, the standard for declaring a mistrial was not satisfied. The trial court did poll the jury by written note, go on the record with counsel to discuss the matter, and briefly consider each side's proposed alternatives to a mistrial. However, the court's consideration of the matter was too abrupt, and its conclusions were not supported by sufficient evidence. The nature of the juror's outside research was unclear to the trial court and yet, instead of further probing what the juror researched and whether it would affect the proceedings, the trial court summarily declared a mistrial. Cf. *Parker*, 145 Mich at 500. Further, despite learning through polling the jurors that only one other juror had knowledge of the outside research, the trial court concluded that the entire jury was tainted. Perhaps this would have been a reasonable conclusion had the trial court elicited

8

information suggesting that the external research somehow affected the other jurors despite the poll results indicating the contrary. But on the record presented, there was no basis for disbelieving the jurors who responded to the written polling by stating that they did not know of the research. The trial court itself acknowledged that "we don't know if the conversation would influence for or against the defense or the prosecution" because "[w]e did not get enough information to even guess at that." Accordingly, the trial court's consideration of less drastic alternatives failed to sufficiently determine the extent of any jury taint and whether it was limited to jurors who could be excused and replaced. Due to these failures, the trial court did not adequately find a justification for mistrial that outweighed the defendant's interest in continuing the trial. *Hicks*, 447 Mich at 829.[4]

---

[4] Justice ZAHRA's partial dissent speculates about what the jurors might have known and whether they understood what "outside research" actually meant. The result of these speculations is the tepid conclusion that there was a "possibility" of juror impropriety. The fact that Justice ZAHRA must guess about mere possibilities is, in large part, the problem with the trial court's handling of the mistrial: we are left to conjecture. Under the caselaw spelled out above, such guesswork does not afford an adequate basis for a finding of manifest necessity—instead, the trial court must find and place on the record the facts justifying its decision. See *Parker*, 145 Mich at 500.

Justice ZAHRA's partial dissent is also mistaken when it suggests that the United States Supreme Court has approved of this speculation in the context of juror bias. See *post* at 12 (ZAHRA, J., concurring in part and dissenting in part), discussing *Washington* 434 US at 512-514. That case, and the case it cited, *Simmons v United States*, 142 US 148; 12 S Ct 171; 35 L Ed 968 (1891), are a far cry from the current matter. In *Washington*, the alleged bias resulted from the defense counsel's opening statement, which the trial court and all the jurors would have witnessed. *Washington*, 434 US at 498-499. The bias in *Simmons* arose from similarly public events. There, during trial, the prosecutor received an affidavit averring that a named juror knew defendant. *Simmons*, 142 US at 149. Defense counsel subsequently sent a letter denying the allegations and commenting upon them; that letter was then published in the newspapers. *Id*. After examining the jurors and determining that they had read the paper, the trial court found that the prejudicial information had been conveyed to the jury by way of the newspaper and that a new trial

For these reasons, the trial court's inquiry was insufficient to find manifest necessity, and therefore, retrial on the 2016 charges violated the Double Jeopardy Clauses of the federal and state Constitutions. Accordingly, we now vacate defendant's two CSC-II convictions that arose from the 2016 charges.

## B. IMPACT ON THE 2017 CHARGES

Because we have found that retrial on the initial charges was barred, we must next determine whether vacating those convictions entitles defendant to a new trial, resentencing, or any other relief regarding his remaining convictions. Defendant claims that he is entitled to a new trial for the 2017 charges because his convictions on those counts were tainted by the admission of evidence during the joint trial relating to the 2016 charges during the joint trial, which would not have been admitted if the 2017 charges had been tried separately. In other words, had the 2017 trial only addressed the 2017 charges—as it should have, given that double jeopardy should have barred retrial of the 2016 charges—the challenged evidence would not have been admissible.[5]

The evidence that defendant challenges includes: (1) the testimony of the complaining victim regarding the 2016 charges, (2) the testimony of defendant's three other daughters, and (3) the testimony of defendant's ex-wife. Generally, we review

---

was necessary. *Id*. at 149-150. The Supreme Court upheld this sensible conclusion. *Id*. at 154-155. No such investigation or findings occurred here, nor was it even clear what potentially prejudicial information was researched by a single juror or how one other juror learned of it.

[5] Defendant has similarly argued that the 2016 and 2017 charges should not have been joined in a single trial, regardless of the double-jeopardy violation, and that therefore the challenged evidence would not have been admissible in the trial of the 2017 charges. We did not order briefing on this issue and decline to address it now.

admission of evidence for abuse of discretion. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). Here, the question arises in a slightly different manner. While the evidence was admitted at the joint trial, the issue is whether the trial court would have abused its discretion if it had admitted this same evidence in a trial limited only to the 2017 charges. Further, we review the interpretation of a related statute de novo. *People v Watkins*, 491 Mich 450, 466-467; 818 NW2d 296 (2012).[6]

---

[6] Justice CAVANAGH'S partial dissent faults us for treating this as an evidentiary error rather than addressing whether to characterize it as some other form of error. But neither she nor the parties have offered any legal analysis supporting another possible characterization of the error or the standard for addressing it. And no one has pointed to any authority suggesting that a properly tried charge is made reversible simply by being tried with a charge ultimately found to violate the Double Jeopardy Clause. The authority we have found suggests the opposite. The United States Court of Appeals for the Second Circuit, in *Pacelli v United States*, 588 F2d 360 (CA 2, 1978), addresses the issue most directly. Vincent Pacelli was convicted of conspiracy to distribute narcotics and two counts of distributing narcotics, but the conspiracy count was ultimately reversed on double-jeopardy grounds. *Id*. at 361. The court rejected a per se rule with regard to the impact of double jeopardy on the properly tried charges. *Id*. at 366. The court determined that presentation of the barred offense alongside the nonbarred offenses was harmless as to the latter because "the testimony of those government witnesses who testified with respect to the conspiracy count also related to the substantive counts, [meaning] the elimination of the conspiracy count would not have significantly altered the defense trial strategy . . . ." *Id*. at 366. Justice CAVANAGH notes that *Pacelli*, 588 F2d at 365, appears to support defendant's contention that if the present error were considered a constitutional error, the burden would be on the prosecution to prove its harmlessness beyond a reasonable doubt. But she fails to offer any explanation of how application of that standard would change the outcome here, and we do not believe that it would.

Similarly, in *Dowling v United States*, the United States Supreme Court considered use of acquitted conduct in a subsequent trial on other charges, treating the issue as an evidentiary question. *Dowling v United States*, 493 US 342; 110 S Ct 668; 107 L Ed 2d 708 (1990). The Supreme Court ultimately held that prosecutors could introduce evidence of an acquitted charge under FRE 404(b) when either (1) the issue being relitigated "is presented in a subsequent action governed by a lower standard of proof" or (2) the defendant "did not demonstrate that his acquittal in his first trial represented a jury determination" of the fact at issue in the subsequent action. *Id*. at 348-349, 350-351.

11

Thus, we must determine whether the testimony of defendant's daughters and ex-wife would have been inadmissible propensity evidence if the charges had been tried separately. Propensity evidence—i.e., evidence admitted to show the defendant's propensity to commit the charged crime—is generally prohibited by MRE 404(b)(1), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

However, MRE 404(b) has been superseded by MCL 768.27a when the latter applies. *Watkins*, 491 Mich at 476-477. That statute states, in relevant part, "in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." MCL 768.27a(1).[7]

---

Finally, we have indicated, outside the double-jeopardy context, that misjoinder is harmless when the evidence would have been admitted in the trial on the separate charge. See *People v Williams*, 483 Mich 226, 244; 769 NW2d 605 (2009) (" '[A] misjoinder may be deemed harmless only if all or substantially all of the evidence of one offense would be admissible in a separate trial of the other.' "), quoting *Byrd v United States*, 551 A2d 96, 99 (DC, 1988). In any event, given the lack of argument on this point and the evident lack of authority supporting the speculation in Justice CAVANAGH's partial dissent that some other framing applies here, we will treat the error as evidentiary for present purposes.

[7] Under MCL 768.27a(2)(a), " '[l]isted offense' means that term as defined in section 2 of the sex offenders registration act, 1994 PA 295, MCL 28.722." "Listed offense" is defined by the Sex Offenders Registration Act as a "tier I, tier II, or tier III offense." MCL 28.722(i).

CSC-II and fourth-degree criminal sexual conduct (CSC-IV) are both listed offenses when committed against a minor. MCL 28.722(t)(*x*), (v)(*v*), and (v)(*vi*). Thus, evidence that defendant committed these offenses is admissible under MCL 768.27a(1). The question, then, is whether the challenged testimony—specifically, the testimony by the complaining victim with regard to the 2016 charges and the testimony of defendant's other three daughters—qualifies as evidence of a CSC-II or CSC-IV offense. TG, the complaining victim in the 2016 charges, testified that her father touched her genitals through her clothes and touched her breasts. She was between 10 and 12 years old when the offenses occurred. These actions satisfy the elements of CSC-II, which is defined as including "sexual contact with another person" when "[t]hat other person is under 13 years of age" or "[t]hat other person is at least 13 but less than 16 years of age and . . . [t]he actor is a member of the same household as the victim." MCL 750.520c(1)(a) and (b)(*i*).[8] MCL 768.27a permits evidence that a defendant is "accused of committing" a listed offense against a minor; it does not require a defendant to have been convicted of a listed offense. So, although defendant's convictions are being vacated for the charges stemming from the

---

[8] " 'Sexual contact' includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for: (*i*) [r]evenge[;] (*ii*) [t]o inflict humiliation[;] [or] (*iii*) [o]ut of anger." MCL 750.520a(q). "Intimate parts" is defined to "include[] the primary genital area, groin, inner thigh, buttock, or breast of a human being." MCL 750.520a(f).

13

2016 allegations, that victim's testimony would still have been admissible under MCL 768.27a even if there had been a separate trial on the 2017 allegations.[9]

This does not end the analysis because "MRE 403 applies to evidence admissible under MCL 768.27a." *Watkins*, 491 Mich at 486. That is, even if the evidence is admissible under MCL 768.27a, it must still comply with MRE 403. Under MRE 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Unfair prejudice occurs " 'when there exists a danger that marginally probative evidence will be given undue or preemptive weight.' " *People v Mardlin*, 487 Mich 609, 627; 790 NW2d 607 (2010), quoting *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). "There are several considerations that may lead a court to exclude such evidence" under MRE 403:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487-488.]

"This list of considerations is meant to be illustrative rather than exhaustive." *Id*. at 488. However, "when applying MRE 403 to evidence admissible under MCL 768.27a, courts

---

[9] Because MCL 768.27a (1) permits evidence of crimes even though no conviction is obtained for those crimes, it applies to the allegations related to the 2016 charges even though the convictions based on those charges are being vacated.

must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Id*. at 487.

Here, the factors weigh in favor of admitting the evidence. Although there were some dissimilarities between the allegations underlying the 2016 charges and those alleged in the 2017 charges, we conclude nevertheless that the probative value would not have been substantially outweighed by a risk of unfair prejudice by admitting this evidence. TG and CS were roughly the same age—TG was between 10 and 12 when the abuse occurred, and CS was 12. Defendant allegedly sexually abused both in his home. The only difference is that TG was defendant's daughter, whereas CS was not related to him. This difference is not enough to warrant exclusion under MRE 403.

Next, the allegations underlying the 2016 charges and the 2017 charges were temporally proximate. The incidents involving TG spanned from 2013 to 2015, while the incident involving CS took place in 2017. In addition, the allegations underlying the 2016 charges did not involve infrequent acts, as TG testified about three separate incidents. See *People v Salloway*, 316 Mich App 174, 195; 891 NW2d 255 (2016) (finding that other acts were not infrequent because the abuse was not a "one-time occurrence"). There are no relevant intervening acts that would have cut against the admission of TG's testimony. While the defense attempted to undermine the reliability of TG's testimony, we conclude that it would have remained more probative than unfairly prejudicial notwithstanding the concerns raised.[10] In addition, we conclude there would have been a need for evidence

---

[10] Testimony was introduced at trial that TG asked others to testify that defendant had touched TG inappropriately or had touched them inappropriately. Nevertheless, her testimony was consistent with multiple other alleged victims.

beyond CS's testimony. No one witnessed the alleged abuse, and while CS did have a forensic examination that showed physical injuries consistent with sexual activity or abuse, that examination did not reveal the presence of defendant's DNA and there was testimony that CS was sexually active with another individual the night that the alleged abuse occurred.

In sum, TG's testimony concerning the 2016 charges shows defendant's propensity to sexually assault children left alone with him in his home and lent credibility to the accusations underlying the 2017 charges. Any risk of unfair prejudice is outweighed by the evidence's probative value.

Defendant also challenges the testimony of his other daughters, AR, ANB, and ADB, who testified that when they were under 17 years old, defendant touched their genitals, rubbed their inner thighs, and slapped them on their buttocks. Depending on the ages of the children and other attendant circumstances, these allegations would satisfy the elements of either CSC-II or CSC-IV. See MCL 750.520c(1)(a) (sexual contact with a person under 13) and (b) (sexual contact with a person at least 13 but less than 16 plus another aggravating factor such as when the victim is a member of the same household as the actor); MCL 750.520e(1)(a) (defining CSC-IV as including sexual contact with a person between 13 and 16 years old when the offender is five or more years older than the victim). Like the 2016 victim's testimony, defendant's other daughters' testimony represents evidence that defendant is accused of committing a listed act, so the analysis of these claims is the same. The testimony of defendant's other daughters as to these instances

16

of abuse constituting listed offenses is evidence of the commission of "listed offenses" and thus is also admissible under MCL 768.27a(1).[11]

We also conclude this evidence would have been admissible under MRE 403 for many of the same reasons that TG's testimony was admissible. All three daughters alleged acts similar to the crime charged regarding CS. Every allegation involved sexual abuse of minors in defendant's home. AR specifically alleged that defendant touched her genitals, as occurred with CS. With regard to ANB, the act alleged—rubbing her upper inner thigh—is similar to, though less egregious than, the charged crime relating to the abuse of CS. In that case, he touched CS in a similar location, her hips, before attempting penetration. ADB likewise alleged inappropriate touching less than penetration.[12]

---

[11] It is true that some of the testimony concerning the alleged incidents involved conduct that may not, by itself, constitute admissible evidence of the commission of a listed offense. Specifically, ANB testified that defendant watched her and her friends change, watched her as she showered, and kissed her on the lips. These acts do not appear to constitute listed offenses. ADB's testimony that defendant sucked on her toes also does not appear to allege a listed offense. Because these acts would not constitute listed offenses, the evidence would have been subject to MRE 404(b). See *Watkins*, 491 Mich at 494 (concluding that evidence that does not qualify as a listed offense must be analyzed under MRE 404(b)). According to MRE 404(b), evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence can only come in for other purposes, such as "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident . . . ." Whether this testimony would have been admissible under MRE 404(b) is doubtful, as it seems to have been admitted to show defendant's propensity to sexually abuse children. But even if this additional evidence would have been inadmissible in a case covering only the 2017 charges, it would not have been sufficiently prejudicial to affect the outcome of the trial and therefore its admission would have been harmless error. The evidence against defendant was strong, especially in light of the admissible other-acts evidence.

[12] Justice CAVANAGH's partial dissent appears to suggest that by analyzing each of these allegations *in the same paragraph* we have somehow run afoul of *Watkins*'s requirement

17

With regard to temporal proximity, while AR's allegations occurred 10 years prior to the episode with CS, AR testified about ongoing abuse and there were no relevant intervening acts cutting against admissibility. ANB and ADB alleged conduct that appears to have been closer in time to the episode with CS.[13] Thus, although the earliest alleged conduct preceded the events of February 2017 by a number of years, much of the conduct was temporally proximate. AR testified to ongoing, frequent acts. Although ANB's and ADB's testimony spoke to isolated acts, the overall evidence revealed a pattern of other acts.[14] Even if ANB and ADB testified to acts that were individually less frequent, the

---

to "consider[] each act separately." *Watkins*, 491 Mich at 493; see *post* at 4 (CAVANAGH, J., concurring in part and dissenting in part) ("Yet when [these allegations from ANB and ADB are] presented in the same paragraph as analysis of the testimony of defendant's other daughter, AR, alleging that defendant touched her vagina with his hands and his mouth, the similarity or dissimilarity of *each* act becomes blurred."). We do not believe *Watkins* requires spatial separation—instead, it requires separate consideration of each of the other acts. While a lengthier analysis (with more spacing) is always possible, that does not necessarily mean its content will improve. Pascal, *The Provincial Letters of Blaise Pascal* (New York: Derby & Jackson, 1859), p 417 ("The present letter is a very long one, simply because I had no leisure to make it shorter."). On a separate note, we acknowledge that the allegations of ANB and ADB were not as extensive as the charged conduct, in that they did not involve penetration; but we also recognize that the charged conduct involved allegations of similar touching that occurred prior to the penetration.

[13] ANB said incidents of abuse occurred the entire time she was with defendant between the ages of 13 and 15. Because ANB was born June 1, 1995, this means the abuse would have occurred between June 1, 2008 and June 1, 2010. TG alleged three incidents of abuse. The first was in February 2013; she did not allege a time period for the second; and the third incident took place in 2015. ADB did not provide any dates, but she moved out of defendant's home at age 17, so any abuse likely happened before then.

[14] We disagree with Justice CAVANAGH's partial dissent that it is improper to consider whether the incidents comprising the other-acts evidence occurred in relation to one another. The *Watkins* factors—which are "illustrative rather than exhaustive"—expressly include the frequency of the other acts and are certainly broad enough to include consideration of the timeline of the other acts. The *Watkins* factors are considerations in

18

testimony was still admissible. No intervening acts have been cited that would suggest the allegations are inadmissible under MRE 403. Finally, just as there would have been a need for TG's testimony, the same need applies to the other daughters' testimony—no one had witnessed the abuse of CS. As to reliability, defendant made no efforts to undermine ANB's or ADB's credibility. Although there was some evidence casting doubt on AR's credibility, her allegations were consistent with those of the other daughters. In sum, under the *Watkins* factors, the probative value of the evidence has not been substantially outweighed by the risk of unfair prejudice.

The last contested evidence is the testimony of defendant's ex-wife. MCL 768.27a does not apply to his ex-wife's testimony that he was rude and impatient with his daughters and wanted custody of them only so that he could receive child-support payments. Defendant's argument that this testimony was inadmissible under MRE 401 and MRE 404 has been made in conclusory fashion. "It is not enough for an appellant . . . simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims . . . and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Rather,

---

the MRE 403 analysis, which generally weighs the probative value of the other-acts evidence against its potential prejudice. From this vantage, whether the other-acts evidence forms a pattern is relevant to determining its probativeness. See *United States v Wacker*, 72 F3d 1453, 1469 (CA 10, 1995) ("Applying this standard, we conclude that the proffered evidence is probative of a material issue and not unduly prejudicial. Although the bad acts testified to at trial occurred well before the offenses charged in the indictment, the prosecution used this testimony to show a long-standing pattern of drug activity from the late 1970s up until the time of appellants' arrest in 1990. Viewed in this light, the evidence is not unrelated and remote, but is integrally related to the criminal activity charged in the indictment.").

defendant must provide this Court with authority to support his argument and demonstrate how the evidence is inadmissible under the rules he cited. See *Goolsby v Detroit*, 419 Mich 651, 655 n 1; 358 NW 2d 856 (1984). Because he failed to provide such an argument, we need not address whether the trial court abused its discretion in admitting this evidence. See *id*.

Even though retrial of the 2016 charges was barred by double jeopardy and the related convictions will be vacated, defendant has not proven he is entitled to relief on his remaining convictions. The daughters' testimony would have been admitted even if defendant had been tried separately on the 2017 charges. And defendant has not developed an argument that his ex-wife's testimony would have been held inadmissible in such a trial.

### C. MANDATORY MINIMUM FOR CSC-I

The final issue is whether the trial court erred by imposing a mandatory minimum sentence of 25 years for a conviction of CSC-I when the charging document did not state that the charge carried that minimum sentence. A CSC-I offense committed by an individual 17 years old or older against an individual under the age of 13 carries a 25-year mandatory minimum sentence. MCL 750.520b(2)(b). The question presented is whether the information must allege the fact triggering the mandatory minimum for each count subject to that minimum. Defendant did not raise this issue at trial or in the Court of Appeals; therefore, we review the issue for plain error. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). Plain error exists when "1) [an] error . . . occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id*. at 763. Even after these prongs are met, "[r]eversal is warranted only when the plain,

20

forfeited error resulted in the conviction of an actually innocent defendant or when an error ' "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence.' " *Id*. at 763, quoting *United States v Olano*, 507 US 725, 736-737; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

Under the Sixth Amendment, a criminal defendant has the right "to be informed of the nature and cause of the accusation[.]" US Const, Am VI. A constitutionally sufficient charging document "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend . . . ." *United States v Resendiz-Ponce*, 549 US 102, 108; 127 S Ct 782; 166 L Ed 2d 591 (2007), quoting *Hamling v United States*, 418 US 87, 117; 94 S Ct 2887; 41 L Ed 2d 590 (1974). The United States Supreme Court's

> definition of 'elements' [of an offense] necessarily includes not only facts that increase the ceiling, but also those that increase the floor. Both kinds of facts alter the prescribed range of sentences to which a defendant is exposed and do so in a manner that aggravates the punishment. . . . Facts that increase the mandatory minimum sentence are therefore elements . . . . [*Alleyne*, 570 US at 108.]

Put another way, a fact is an element when it "increases the punishment above what is otherwise legally prescribed" or "increase[s] the mandatory minimum sentence." *Id*.

This rule applied to jury findings in *Alleyne*, but it also applies to what must be charged in an indictment. *Id*. at 112. The *Alleyne* Court explained that "if 'a statute prescribes a *particular punishment* to be inflicted on those who commit it under special circumstances which it mentions, or with particular aggravations,' . . . those special circumstances must be specified in the indictment." *Id*., quoting 1 J. Bishop, Criminal Procedure 50, § 598, pp 360-361 (2d ed). This requirement is meant to allow "the

21

defendant to predict the legally applicable penalty from the face of the indictment." *Id*. at 113-114.

As noted, the defendant must be "17 years of age or older" for the 25-year mandatory minimum in MCL 750.520b(2)(b) to apply. If the defendant's age is not charged and found by the jury, there is no mandatory minimum. See MCL 750.520b(2)(b); see also *Alleyne*, 570 US at 116-117. Accordingly, this fact increases the minimum penalty of the crime and therefore is an element that must be charged. Here, defendant was convicted of two counts of CSC-I, only one of which charged him as a person "17 years of age or older." The other count charged him for "engag[ing] in sexual penetration . . . with a child under 13 years of age[.]" See MCL 750.520b(1)(a). The trial court applied the mandatory minimum to both counts of CSC-I despite only one of them being charged as "Defendant 17 years of age or older." This was plainly in error.[15]

The prosecution admits this error, but contends the error was harmless under the third *Carines* prong. However, we need not address whether the error was harmless because defendant cannot meet the fourth prong of the plain-error test. See *Carines*, 460

---

[15] Defendant also notes that this count "does not reference the statutory section establishing the mandatory minimum." But he has failed to develop this argument, and he cites no authority for the proposition that the Sixth Amendment requires the information to cite the statute and indicate that the defendant will be subject to a mandatory minimum sentence. See *People v Head*, 323 Mich App 526, 546; 917 NW2d 752 (2018) (holding that by failing to cite any relevant authority defendant failed to properly present the argument that "the habitual-offender notice did not indicate that defendant would be subject to a 25-year mandatory minimum sentence"). Further, the information did cite the statute in the other charge arising out of the same incident. And, as noted below, defendant had knowledge of the relevant underlying fact—i.e., that he was 17 years old or older—that gave rise to the mandatory minimum. In these circumstances, we decline to address defendant's undeveloped argument.

Mich at 763-764. In *United States v Cotton*, a case involving evidence that increases the statutory maximum sentence, the United States Supreme Court found that the omission of the quantity of a drug from the indictment "did not seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings" because the evidence establishing the quantity "was 'overwhelming' and 'essentially uncontroverted.' " *United States v Cotton*, 535 US 625, 632-633; 122 S Ct 1781; 152 L Ed 2d 860 (2002), quoting *Johnson v United States*, 520 US 461, 469-470; 117 S Ct 1544; 137 L Ed 2d 718 (1997).

Here, defendant contends that the error significantly affected the fairness of the trial. Specifically, he contends that failure to charge the fact of his age and the mandatory minimum statute as to both counts deprived him of proper notice of the judgment he received upon conviction. Defendant does not contest that he was over the age of 17 at the time he committed both counts of CSC-I and, in any event, the jury found that he was over the age of 17 at the time he committed both counts of CSC-I beyond a reasonable doubt.[16] And certainly, he had notice of his age and he could learn from the information's statement of the first count that his age (and the age of the victim) potentially subjected him to the same mandatory minimum sentence in MCL 750.520b(2)(b) that was cited in the first count. Cf. *United States v Yancy*, 725 F3d 596, 602-602 (CA 6, 2013) (holding that failure to include an element in the indictment did not deprive the defendant of notice when the defendant admitted to the relevant conduct and knew of the applicable sentencing enhancement when he did so). Further, defendant does not explain how the trial was unfair

---

[16] Although it was not charged this way in the information, the trial court instructed the jury, *on each count*, that it had to find the victim was under 13 years old and that defendant was 17 years old or older when he committed the offenses charged.

23

because of these considerations or what alternative action he would have taken with notice of the additional mandatory minimum charge.

This conclusion is further supported by how the Court addressed the fourth prong in *Carines*. In that case, the defendant alleged that the trial court improperly convicted him of felony murder by blending the felony-murder and aiding-and-abetting instructions together. *Carines*, 460 Mich at 768-769.[17] The trial court instructed that the prosecution needed to prove that the victim was killed by one of the robbers during the robbery, that there was malice, and that the defendant must have participated in the robbery. *Id*. However, the defendant complained that the instructions did not include the second element of aiding and abetting: "that defendant must have performed acts or given encouragement that assisted the commission of the [robbery]." *Id*. at 769. We held that this error did not satisfy the fourth prong of the plain-error standard even if it was not harmless because "the jury could not have reasonably concluded that defendant participated in the robbery and acted with malice without also concluding that he

_____

[17] *Carines* explained that the "the elements of felony murder are: 1) the killing of a human being, 2) malice, and 3) the commission, attempted commission, or assisting in the commission of one of the felonies enumerated in the statute, among them armed robbery." *Carines*, 460 Mich at 768, citing *People v Turner*, 213 Mich App 558, 566; 540 NW2d 728 (1995), disapproved of on other grounds by *People v Mass*, 464 Mich 615, 628 (2001). *Carines* explained that the elements of aiding and abetting are: "(1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *Carines*, 460 Mich at 768, quoting *Turner*, 213 Mich App at 568; but see *Mass*, 464 Mich at 628 (explaining that "[c]onviction of a crime as an aider and abettor does not require a higher level of intent with regard to the commission of the crime than that required for conviction as a principal. To the extent the cited language from *Turner*[, including the third element,] may suggest otherwise, it is disapproved") (citation omitted).

24

participated in the killing . . . ." *Id*. at 772.  Likewise, as noted, the jury in this case concluded that defendant was at least 17 years old for both counts.  Both counts arose out of defendant's actions on a particular date, so he necessarily was the same age when the conduct supporting each count occurred.

For these reasons, defendant is not entitled to resentencing.

### III.  CONCLUSION

In conclusion, we hold that the trial court abused its discretion by declaring a mistrial in the initial trial without conducting a sufficient inquiry to support a finding of manifest necessity.  As a consequence, those convictions will be vacated.  However, with regard to his remaining convictions, because the evidence presented accusing defendant of committing prior acts of CSC against minors would have been admissible in a separate trial under MCL 769.267a and MRE 403—and defendant has not sufficiently developed an argument that his ex-wife's testimony would have been inadmissible—we hold that defendant is not entitled to a new trial, resentencing, or other relief.  Finally, we hold that the trial court committed plain error by imposing a mandatory minimum sentence of 25 years under MCL 750.520b(2)(b) for the second count of CSC-I because the age requirement is an element that must be charged in the information and found by the jury, and it was not charged here.  However, resentencing is unnecessary because the error did not affect the fundamental fairness of the trial.

David F. Viviano
Bridget M. McCormack
Richard H. Bernstein
Elizabeth T. Clement

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

  Plaintiff-Appellee,

v              Nos. 160668-9

JAMES CURTIS BECK,

  Defendant-Appellant.

---

ZAHRA, J. (*concurring in part and dissenting in part*).

  While I concur with the majority opinion that defendant is not entitled to relief in Docket No. 160669 for his acts against CS, I respectfully dissent from the decision in Docket No. 160668 to vacate defendant's convictions for his acts against TG on double-jeopardy grounds.[1] From my view, the majority opinion fails to give adequate deference to the trial court's decision to declare a mistrial. Instead, with the benefit of hindsight, the majority opinion lays out a more prudent course of action that the trial court could have followed when confronted with evidence that a juror investigated matters outside the trial

---

[1] Given my conclusion that no double-jeopardy violation occurred in Docket No. 160668, I would not reach the questions of whether vacating those convictions entitles defendant to a new trial, resentencing, or any other relief on his other convictions in Docket No. 160669. I agree, however, with the majority opinion that the omission of defendant's age as an element of the second count of first-degree criminal sexual conduct in Docket No. 160669 does not warrant resentencing under *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

proceedings. I agree that the trial court could have proceeded differently. But our caselaw has long held that decisions made by trial court judges in the heat of the moment and in the course of an ongoing trial are reviewed for an abuse of discretion. An abuse of discretion is not found merely because the trial court could have acted differently or because a reviewing court would have reached a different result. An abuse of discretion will only be found when the court's decision falls outside the range of principled outcomes.[2] Considering the totality of the facts and circumstances of this case, I conclude that the trial court did not abuse its discretion in declaring a mistrial when confronted with evidence that the jury may have been tainted. Because manifest necessity existed to support the trial court's declaration of a mistrial, defendant's retrial was not barred by double jeopardy. Accordingly, I would affirm defendant's convictions in Docket No. 160668.

## I. PERTINENT FACTUAL BACKGROUND

In July 2016, defendant was tried for two counts of second-degree criminal sexual conduct (CSC-II) for acts against his ex-wife's daughter, TG. After three days of testimony, the case was submitted to the jury on Friday, July 8, 2016. Roughly four hours into deliberation, the court received a note asking what happens when the jury is hung. The court brought the jury into the courtroom, read the standard instruction for a deadlocked jury, also known as an "*Allen* charge,"[3] and sent the jury back to deliberate for the remainder of the day.

---

[2] *People v Watkins*, 491 Mich 450, 467; 818 NW2d 296 (2012).

[3] "The term '*Allen* charge' is the generic name for a class of supplemental jury instructions given when jurors are apparently deadlocked; the name derives from the first Supreme

2

At some point between the jury being sent back to deliberate and its dismissal for the weekend, one juror, Juror 337, informed the court that another juror, Juror 255, had done outside research on the case. There is no record of this initial interaction with Juror 337 in the July 8, 2016 transcript. Instead, the first reference to a juror possibly conducting outside research appears in the July 11, 2016 transcript, the following Monday. That morning, the court informed the jury that "there may have been some outside research done on topics or issues with regard to this trial" and asked the jurors whether they knew of any such research being conducted. Receiving no response, the trial court asked the jurors to return to the jury room and write their juror numbers on a piece of paper along with any information they had about whether anyone "has done any outside research on topics at issue here." The court recounted the responses it received as follows:

> Okay. So I've received notes back from all jurors. There's only two at issue. One is from Juror 337, who we spoke to on Friday afternoon, who indicated: What I heard was not about the case, but a juror was looking into another discretion [sic] within his family.
>
> And then, another response from Juror 255: I didn't do any research on the case itself, nor do I know if anyone else did. Without mentioning anything about the case, I asked my mom about her past experience. . . .
>
> All the rest of the jurors had nothing significant to report.[4]

The court invited responses from the parties on how to proceed. The prosecutor believed that both jurors had been tainted and requested that they be replaced with two

Court approval of such an instruction in [*Allen v United States*, 164 US 492; 17 S Ct 154; 41 L Ed 528 (1896)]." *United States v Berger*, 473 F3d 1080, 1089 (CA 9, 2007). Michigan's standard instruction for a deadlocked jury is found at M Crim JI 3.12.

[4] These notes were not preserved in the lower court file.

3

alternate jurors. Defense counsel objected to the substitution, argued that neither juror had brought any extraneous information into the case, and advocated in favor of having the original 12 jurors deliberate the case. The parties further elaborated on their respective positions:

[*The Prosecutor*]: The People's position is the way it is for the following reason: Obviously, that means juror number [337][5] heard and/or perhaps was influenced, we don't know because we can't know what his findings are, but . . . it was to the point where he thought it was important that he brought it to this court's attention. He specifically said that he thought, and I was writing down what he[ said], the best I could, because he was sort of in circles about what he said, but he said that what the juror was saying struck him as against the instructions this court had given him. *Specifically, he said that juror had spoke*[*n*] *to someone who had* [*t*]*his history of incidents and intended to determine the actions before and after to get an understanding of the actions in this case and why a person would do this or why a person wouldn't do that.*

And so, clearly, juror number [337] heard that and was influenced and/or . . . perhaps not influenced, but heard that. So he would be tainted for that reason. And, then, obviously, juror number [255], by his own admission, he indicated that although . . . he didn't speak about the case. He said he spoke to his mom, but, obviously, brought that information that he spoke with his mom about into the jury room. That's how the juror knew about it.

So, Judge, in order to not have a mistrial based on manifest injustice here, the People are suggesting that . . . a solution is to in fact ask that those two jurors be excused and ask the alternat[e] jurors be replaced. . . .

[*Defense Counsel*]: Your Honor, brief response. We're not seeking a mistrial. If the prosecutor seeks a mistrial, then it's double jeopardy. They're not seeking a mistrial either. Really, what we're talking about is a challenge for cause during deliberation. And if the Court's wrong and does remove for

---

[5] The court and parties referred to the jurors by their juror numbers and seat numbers interchangeably. To avoid confusion, this opinion refers to the jurors by their juror numbers.

4

cause and there's a conviction, it's reversible error. I say we go with the 12 jurors.

Now, in the alternative, you could bring in each juror, the two jurors involved, individually and ask specifically what did you say, what did you learn, what do you know.[6]

The trial court disagreed with defense counsel that double jeopardy would bar retrial if the court declared a mistrial on these grounds and expressed its concerns about the extraneous information, stating:

I disagree it would be double jeopardy for the prosecution if the Court calls a mistrial based on issues brought up by the jurors. So, that part I disagree with.

I have serious concern about juror number 255, who apparently -- and we do not know what experience he inquired about someone else. The other person . . . who he inquired with doesn't know anything about this case. But, what the juror knows is what's important.

I can't say juror number 337 was necessarily influenced because he seemed a little unsure as to specifically what he was even hearing. But, I do have concerns regarding [juror number] 255.

The prosecution added that the jury may have misunderstood that "outside research" included gaining insight from nonjurors and offered additional information about the initial interaction with Juror 337:

[I]f juror number [337] heard it, then, perhaps, it could be a presumption . . . that all the jurors had heard that. And when we ask them to go back into the jury room, we ask about specifically research. And I can't get in their heads, but [when] we spoke about research, oftentimes, we spoke about getting on the internet and bringing that information in, as opposed to perhaps just getting outside insight, which they're not allowed to do that either. . . . [W]e didn't feel like we had to spell that out for them, but that appears to be what did happen. And . . . *I'm not sure that juror number [337]*

---

[6] Emphasis added.

*was sitting with juror number [255] and they are the only two that had that conversation. It sounded as though there was a conversation in front of the whole jury, based on what juror number [337] said. So it's almost as if the entire jury had heard that. So if we determine that someone is tainted by that, the whole jury has been tainted by it.*[7]

After hearing from both parties, the trial court, over defendant's objection, declared a mistrial, stating:

> Quite honestly, we don't know if the conversation would influence for or against the defense or the prosecution. . . .
>
> We did not get enough information to even guess at that.
>
> . . . [T]he response from juror number 255 . . . says: Without mentioning anything about the case, I asked my mom about her past experience. Another juror overheard a conversation that sounds like it wasn't even with [juror number] 337 [sic: 255][8] but with yet another juror, and picked up enough about what that juror had said.
>
> At this point, I think the jury is tainted and I don't think bringing in two alternat[es] is going to help. I am going to declare a mistrial.

Defendant was later convicted of the two CSC-II counts as to TG at a subsequent trial held in 2017. The Court of Appeals affirmed his convictions, holding that his retrial did not violate double jeopardy.

---

[7] Emphasis added.

[8] Given that Juror 337 overheard that Juror 255 brought extraneous information into the jury room, it appears the trial court misspoke here and meant to refer to Juror 255.

## II. LEGAL BACKGROUND

"Under both the Double Jeopardy Clause of the Michigan Constitution and its federal counterpart, an accused may not be 'twice put in jeopardy' for the same offense."[9] The Double Jeopardy Clause "protects a criminal defendant from repeated prosecutions for the same offense."[10] This protection encompasses the "accused's valued right to have his trial completed by a particular tribunal" once jeopardy has attached.[11] "Jeopardy is said to 'attach' when a jury is selected and sworn, and the Double Jeopardy Clause therefore protects an accused's interest in avoiding multiple prosecutions even where no determination of guilt or innocence has been made."[12] "If the trial is concluded prematurely, a retrial for that offense is prohibited unless the defendant consented to the interruption or a mistrial was declared because of a manifest necessity."[13] Defendant did

---

[9] *People v Lett*, 466 Mich 206, 213; 644 NW2d 743 (2002), citing Const 1963, art 1, § 15, and US Const, Am V. See also *Benton v Maryland*, 395 US 784; 89 S Ct 2056; 23 L Ed 2d 707 (1969) (holding that the Fifth Amendment's protection against double jeopardy applies to the states through the Fourteenth Amendment).

[10] *Oregon v Kennedy*, 456 US 667, 671; 102 S Ct 2083; 72 L Ed 2d 416 (1982). "The Double Jeopardy Clause has often been described, in simple terms, as embodying three separate guarantees: protection against a second prosecution for the same offense following acquittal, protection against a second prosecution for the same offense following conviction, and protection against multiple punishments for the same offense." *Lett*, 466 Mich at 214 n 9.

[11] *Lett*, 466 Mich at 214 (quotation marks and citation omitted).

[12] *Id*. at 215 (citations omitted).

[13] *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). See also *Lett*, 466 Mich at 215 ("[R]etrial is always permitted when the mistrial is occasioned by 'manifest necessity.' ").

not consent to the mistrial; therefore, the inquiry turns on whether "manifest necessity" existed, compelling the mistrial.

In *Arizona v Washington*, the Supreme Court of the United States reiterated the "classic formulation" for whether "manifest necessity" exists to warrant a mistrial:

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."[14]

" 'Manifest necessity' is not to be interpreted literally or applied mechanically; what is required is a 'high degree' of necessity."[15]  "Furthermore, differing levels of appellate scrutiny are applied to the trial court's decision to declare a mistrial, depending on the nature of the circumstances leading to the mistrial declaration."[16]  "The strictest scrutiny is employed when the mistrial was premised on bad-faith conduct by the judge or prosecutor, and the most relaxed scrutiny is employed when the mistrial was premised on a deadlocked

---

[14] *Arizona v Washington*, 434 US 497, 506 & n 18; 98 S Ct 824; 54 L Ed 2d 717 (1978) (ellipsis omitted), quoting *United States v Perez*, 22 US (9 Wheat) 579, 580; 6 L Ed 165 (1824).

[15] *Ross v Petro*, 515 F3d 653, 660-661 (CA 6, 2008), quoting *Washington*, 434 US at 506.

[16] *Lett*, 466 Mich at 218.

8

jury."[17]  In cases such as this, "when some event creates the possibility that the jury may have been biased, the decision of the trial judge who has had the opportunity to observe the sequence of events in the context of the trial is entitled to special respect."[18]  "[T]he trial judge's evaluation of the possibility of juror bias is entitled to 'great deference,' "[19] and "[a] reviewing court must 'accord the highest degree of respect to the trial judge's evaluation of the likelihood' that the circumstances giving rise to the mistrial would have affected the impartiality of the deliberations of the jury."[20]

Although the trial court's decision to declare a mistrial on these grounds is afforded great deference, its discretion is not unlimited.  "Determining whether manifest necessity exists to justify the declaration of a mistrial requires a balancing of competing concerns: the defendant's interest in completing his trial in a single proceeding before a particular tribunal versus the strength of the justification for a mistrial."[21]  To ensure the defendant's interest is adequately protected, the reviewing court must be satisfied that the trial court did not act "irrationally or irresponsibly," but instead "exercised 'sound discretion' in declaring a mistrial."[22]  A trial court is not required to make explicit findings of manifest

---

[17] *Ross*, 515 F3d at 661.

[18] *Gilliam v Foster*, 75 F3d 881, 894 (CA 4, 1996), citing *Washington*, 434 US at 512-514.

[19] *Ross*, 515 F3d at 661 (emphasis omitted), quoting *Washington*, 434 US at 511-514.

[20] *Gilliam*, 75 F3d at 894, quoting *Washington*, 434 US at 511.

[21] *People v Hicks*, 447 Mich 819, 829; 528 NW2d 136 (1994) (opinion by GRIFFIN, J.).

[22] *Washington*, 434 US at 514.

9

necessity, nor must it articulate on the record all the factors informing its decision to declare a mistrial, as long as sufficient justification for the ruling exists on the record.[23] Our court rules simply require that "[b]efore ordering a mistrial, the court must, on the record, give each defendant and the prosecutor an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives."[24] Ultimately, "the mere fact that the reviewing court would not have declared a mistrial under the circumstances of this case does not mean that retrial is necessarily barred. The issue is not whether this Court would have found manifest necessity, but whether the trial court *abused its discretion* in finding manifest necessity."[25]

## III. APPLICATION

Applying the aforementioned principles, I cannot conclude that the trial court abused its discretion in declaring a mistrial. After learning that a juror may have conducted outside research on the case, the trial court took reasonable measures of asking each juror to inform the court whether any outside research had been done. The court received two responses that both seemed to refer to the same extraneous information. The court then heard argument from both parties on how they wished to proceed, considered the parties' alternatives to declaring a mistrial, found those alternatives inadequate to cure the taint of possible juror bias, and ultimately declared a mistrial. These facts alone demonstrate that

---

[23] *Id*. at 516-517; *Lett*, 466 Mich at 222 ("[W]here the basis for a mistrial order is adequately disclosed by the record, the ruling will be upheld.").

[24] MCR 6.417.

[25] *Lett*, 466 Mich at 220.

10

the trial court dutifully complied with its obligation under the court rules and acted deliberately and responsibly rather than abruptly or precipitously.

Further, a review of the record as a whole demonstrates that extraneous information was indeed brought into the jury room and created the *possibility* of juror bias sufficient to support a finding of manifest necessity to warrant a mistrial. By written submission, Juror 255 stated that he asked his mother about her past experience of sexual assault. Also, according to the prosecutor's recounting of the initial conversation with Juror 337 on July 8, 2016, Juror 255 "had spoke[n] to someone who had [t]his history of incidents and intended to determine the actions before and after to get an understanding of the actions in this case and why a person would do this or why a person wouldn't do that."[26] Juror 255's actions—i.e., seeking an outside perspective on how a sexual assault may impact a person's behavior in order to assist him in deciding defendant's criminal sexual conduct case—were clearly improper and created the possibility of juror bias.

The context in which this possible juror bias arose also cannot be ignored. After the jury asked the court what would be the ramifications of a hung jury, the court issued an *Allen* charge encouraging further deliberation. Thereafter, Juror 337 informed the court of Juror 255's impropriety. The timing of these events gives rise to an inference that Juror 255 may have been trying to persuade other jurors on a particular disposition, which clearly

---

[26] Although there is no transcript of this conversation, we are not precluded from considering the prosecutor's statements and arguments that informed the trial court's declaration of a mistrial. See *Washington*, 434 US at 517 ("The basis for the trial judge's mistrial order is adequately disclosed by the record, which includes the extensive argument of counsel prior to the judge's ruling.").

would have affected the impartiality of the jury as a whole. This inference was not lost on the trial court, which concluded that other jurors, in addition to Juror 337, had been exposed to the extraneous information and that the entire jury had been tainted.[27] In short, the circumstances giving rise to the *possibility* of juror bias occurred at a critical point in defendant's trial, and the trial court acted within its discretion in concluding that these circumstances warranted a mistrial. "[T]he overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of *one or more jurors may have been affected*" by the impropriety.[28] That the trial court did not elicit the precise information learned, or the extent to which that extraneous information may have influenced each juror, does not invalidate the court's decision to declare a mistrial.[29] It is

---

[27] This conclusion is supported by the prosecutor's recounting of the July 8, 2016 conversation with Juror 337, which suggests that the entire jury had been exposed to the extraneous information. Further, although the other jurors' written responses indicated that they were not aware of any outside research being done on the case, the prosecutor noted that the jury likely did not understand that "outside research" included gaining insight from nonjurors. Indeed, Juror 255 stated that he "didn't do any research on the case itself," despite bringing extraneous information into the jury room, and Juror 337 stated that the information he overheard was "not about the case." These responses bolster the notion that other jurors also may have misunderstood what amounted to impermissible "outside research" done on topics or issues in the case.

[28] *Id*. at 511 (emphasis added).

[29] See *id*. at 512 (noting that, in *Simmons v United States*, 142 US 148; 12 S Ct 171; 35 L Ed 968 (1891), the Supreme Court upheld the trial court's declaration of a mistrial based on the possibility of juror bias even though the trial court had not "determin[ed] the truth or falsity of the charge" or "examin[ed] the jurors to ascertain what influence [the extraneous information] had upon them").

the trial court, not this Court, that is in the best position to assess the possibility of juror bias.[30]  Although neither the prosecutor nor defense counsel was at fault, "[n]either party has a right to have his case decided by a jury which *may* be tainted by bias[.]"[31]

I am also not convinced that the trial court was required to give the sort of extensive consideration of "less drastic alternatives" that the majority opinion seems to mandate.[32]  In *Washington*, the trial court declared a mistrial based on defense counsel's improper argument during his opening statement.[33]  The Supreme Court of the United States upheld the trial court's decision even though the mistrial was not strictly "necessary" insofar as an appropriate cautionary instruction may have counteracted the possibility of juror bias.[34]  In

---

[30] As the Supreme Court explained in *Washington*, 434 US at 513-514:

> There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias.  He has seen and heard the jurors during their *voir dire* examination.  He is the judge most familiar with the evidence and the background of the case on trial.  He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors.  In short, he is far more conversant with the factors relevant to the determination than any reviewing court can possibly be.  [Quotation marks and citation omitted.]

[31] *Id*. at 516 (emphasis added).  Because the "possibility" and "risk" of juror bias alone can warrant a mistrial, *id*. at 512-513, I disagree with the majority opinion that my position rests upon speculation and conjecture.  Rather, the facts and circumstances apparent from the record support the trial court's declaration of a mistrial based on Juror 255's impropriety, which created a situation in which the entire jury may have been tainted.

[32] *Ante* at 9.

[33] *Washington*, 434 US at 498-499.

[34] *Id*. at 511.

*People v Lett*, this Court recognized that *Washington* does not require trial courts to examine alternatives or make findings on the record before declaring a mistrial, even noting that this Court's prior decisions requiring such examination rely on caselaw of questionable validity in light of *Washington*.[35]  Indeed, our court rules simply require trial courts to give the parties "an *opportunity* . . . to suggest alternatives" on the record before declaring a mistrial,[36] and the trial court undoubtedly complied with this directive.

---

[35] *Lett*, 466 Mich at 221-222 & n 13 ("[I]n support of the proposition that consideration of alternative measures is constitutionally required . . . , this Court in [*People v Benton*, 402 Mich 47; 260 NW2d 77 (1977),] cited two federal circuit court opinions that were subsequently overturned by the United States Supreme Court[.]").  Compare *Hicks*, 447 Mich at 843-844 (opinion by GRIFFIN, J.) (holding that the trial court's "failure to consider alternatives precludes a determination that manifest necessity justified [its] declaration of a mistrial"), citing *Benton*, 402 Mich 47, with *Hicks*, 447 Mich at 867 (BOYLE, J., dissenting) ("The assumption that, as a matter of law, manifest necessity requires the exploration of less drastic alternatives to mistrial also ignores that the United States Supreme Court has specifically rejected the proposition that all other alternatives to a mistrial must be explored on the record in the context of a mistrial triggered by the possibility of bias.  In [*Washington*, 434 US at 511, 516-517], the Court held that the record did not have to reflect the exploration and rejection of all available alternatives so as to establish the necessity for mistrial.").

The majority opinion states that even if consideration of alternatives is not constitutionally required, the trial court's failure to consider alternatives in this case supports the majority opinion's conclusion that the trial court acted precipitately in declaring a mistrial.  Not only does the majority opinion ignore the trial court's actual consideration of the alternatives proposed by the parties, see pp 3-6 and 14-15 of this opinion, it admittedly demands more of our trial courts than is constitutionally required.  Indeed, if trial courts, in safeguarding a defendant's *constitutional* right against double jeopardy, are not *constitutionally* required to consider alternatives to declaring a mistrial, what other basis is there for requiring such consideration?

[36] MCR 6.417 (emphasis added).

14

In any event, the trial court's consideration of the parties' proposed alternatives was adequate. Defense counsel's requests to have the original 12 jurors decide the case or bring Jurors 255 and 337 into the courtroom for further questioning ignores the trial court's conclusion that Juror 255's impropriety had tainted the entire panel. Also, defense counsel objected to the prosecutor's request to substitute Jurors 255 and 337 with two alternates, even arguing that their removal would amount to error requiring reversal. Defense counsel therefore left the trial court with two options: either continue the trial with a jury that the court believed was tainted, or declare a mistrial and give the parties a fresh start with a jury untainted by the possibility of bias. Under these circumstances, the trial court did not abuse its discretion in declaring a mistrial.

In sum, the trial court "exercised 'sound discretion' in handling the sensitive problem of possible juror bias created" by Juror 255 bringing extraneous information into the jury room.[37] The trial court "acted responsibly and deliberately," "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial," and reasonably concluded that the possibility of juror bias permeated the jury room such that it was questionable whether an impartial verdict could be reached.[38] "[I]n these circumstances, the public's interest in fair trials designed to end in just judgements must prevail over the defendant's valued right to have his trial concluded before the first

---

[37] *Washington*, 434 US at 516.

[38] *Id*. at 515-516. See also *Illinois v Somerville*, 410 US 458, 464; 93 S Ct 1066; 35 L Ed 2d 425 (1973) ("A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached . . . .").

15

jury impaneled."[39] Accordingly, manifest necessity existed to support the trial court's declaration of a mistrial, and defendant's retrial was not barred by double jeopardy. Because this Court concludes otherwise, I respectfully dissent on this issue.

Brian K. Zahra

---

[39] *Washington*, 434 US at 516 (quotation marks and citation omitted).

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                                                          Nos. 160668-9

JAMES BECK,

       Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I concur in Part II(A) of the majority opinion because I agree that the trial court abused its discretion by finding that a manifest necessity required the declaration of a mistrial. *People v Lett*, 466 Mich 206, 220; 644 NW2d 743 (2002). Accordingly, defendant's second trial on the charges of criminal sexual conduct allegedly perpetrated against TG violated the Double Jeopardy Clauses of both our state and federal Constitutions, and those convictions must be vacated. I do not, however, join the remainder of the opinion.

Because the now-vacated, constitutionally problematic 2016 charges were consolidated into a single trial with charges related to a different victim arising from conduct that occurred in 2017, the focus of Part II(B) of the majority opinion is whether the 2017 convictions were impermissibly tainted by the introduction of the 2016 charges and additional "other acts" evidence. The Court of Appeals, of course, has not yet

addressed this analytical oddity.[1]  For that reason, I would have preferred to remand this case to the lower court for its full consideration and to allow defendant to make additional arguments in light of today's ruling.  Beyond that, I find the majority's analysis lacking. For example, it engages only in a footnote with how to characterize defendant's claimed error concerning the admission of other-acts evidence when charges that were the basis of a constitutionally prohibited trial are joined with charges forming the basis of a constitutionally permissible trial.[2]  Nor does it discuss how that characterization might affect preservation or the appropriate standard of review.

Most troubling in my view, however, is the majority's failure to faithfully conduct the analysis set forth by this Court in *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012).  *Watkins* discussed MCL 768.27a, which allows evidence that a defendant committed a listed offense against a minor to be admitted for consideration "for its bearing on any matter to which it is relevant." MCL 768.27a(1).  This includes propensity evidence

---

[1] The panel summarily dismissed a related argument below, declining to fully address the issue because it concluded defendant's briefing was not sufficient.

[2] Defendant argues that the admission of evidence that formed the basis of the 2017 charges, barred from retrial by double-jeopardy principles, was a preserved constitutional error.  That would mean that the prosecutor bears the burden of showing that the error was harmless beyond a reasonable doubt.  See *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020) ("This Court reviews preserved constitutional errors to determine whether the beneficiary of the error has established that the error was harmless beyond a reasonable doubt.").  The majority characterizes the error as an evidentiary error, while citing at least one case that would suggest that defendant's designation of the error may be correct.  See *Pacelli v United States*, 588 F2d 360, 364-365 (CA 2, 1978) (holding that the "spillover effects" of a double-jeopardy-barred charge being tried alongside properly lodged charges was a constitutional claim subject to review for whether the error was harmless beyond a reasonable doubt).  While I express no opinion on what standard is correct, I believe this ambiguity between evidentiary and constitutional error further supports that a remand would be appropriate.

2

that would generally be barred from admission. *Watkins*, 491 Mich at 470. Evidence introduced under MCL 768.27a remains subject to MRE 403, but the propensity inference of that evidence is drawn in favor of the evidence's probative value, not the danger of unfair prejudice. *Watkins* cautioned, however, that MCL 768.27a did not provide carte blanche to admit overly prejudicial evidence. *Watkins*, 491 Mich at 487. The Court listed several considerations that might lead a court to exclude such evidence. *Id*. at 487-488.[3] Importantly for present purposes, this Court was careful to note that the MRE 403 analysis must be applied "to each separate piece of evidence offered under MCL 768.27a." *Watkins*, 491 Mich at 489. When applying this new rule in *Watkins*, the Court explained that the trial court erred when it "failed to review separately under MRE 403 each act alleged . . . and instead lumped all of the evidence together." *Id*. at 493. It reiterated, "The trial court should have considered each act separately." *Id*.

Despite this clear directive in *Watkins*, the majority opinion fails to heed its instruction to balance *each* separate piece of evidence under MRE 403. It "lumps" all the other-acts-evidence testimony of defendant's teenaged daughters into one conclusory analysis. By approaching the analysis in this way, it is cloudy, at best, regarding whether some of the evidence admitted under MCL 768.27a should have been admissible under MRE 403. For example, ANB testified that defendant had "mov[ed] his hand up [her]

---

[3] These considerations, or the "*Watkins* factors," include:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487-488.]

3

thigh," which made her uncomfortable. ADB testified that defendant would "smack [her] butt" when she did the dishes. To assert that these instances of inappropriate touching are similar to the charged conduct at issue in the 2017 trial—violent sexual penetration—is untenable.[4] Yet when the testimony of ANB and ADB is presented in the same paragraph as analysis of the testimony of defendant's other daughter, AR, alleging that defendant touched her vagina with his hands and his mouth, the similarity or dissimilarity of *each* act becomes blurred.[5]

The majority opinion may ultimately reach the correct result—that there were no errors in the admission of the evidence discussed or that any errors were not prejudicial enough to defendant to warrant reversal.[6] Even still, instead of engaging in a truncated analysis, I believe it would have been much more prudent to remand to the Court of

---

[4] I do not suggest that for other-acts evidence to be admissible under MCL 768.27a it must be identical to the charged conduct, but acknowledging dissimilarities is an important part of the MRE 403 analysis.

[5] The majority agrees that *Watkins* requires separate consideration of each act, but does not believe that "spatial separation" is necessary for such consideration. Respectfully, in my view, a robust *Watkins* analysis does require a lengthier analysis. Here, that would look like an MRE 403 balancing of AR's allegations, then an MRE 403 balancing of ANB's allegations, and then an MRE 403 balancing of ADB's allegations. I believe this would help avoid what I believe to be the murkiness in the majority's approach to the *Watkins* analysis.

[6] I note that I agree with the majority that some of the daughters' testimony involved conduct that was not admissible pursuant to MCL 768.27a because it did not involve a "listed offense." I further agree that the propriety of the admission of this evidence is governed by traditional principles concerning MRE 404(b) evidence and that it is doubtful that this evidence should have been admitted. That said, because I do not join the majority's conclusion that all of the other-acts evidence was admissible under *Watkins*, I am unable to opine on whether the admission of this propensity evidence was harmless or not.

4

Appeals for full consideration in the first instance. By taking that route, our opinion would properly encourage our trial courts to zealously guard against the admission of unfairly prejudicial propensity evidence. And, after the review of our intermediate court, this Court would have been in a much better position to review defendant's arguments. Instead, the majority applies *Watkins*[7] in a way that I believe signals to the trial courts that "anything goes." Therefore, I respectfully dissent from Part II(B) of the majority opinion.[8]

Megan K. Cavanagh
Elizabeth M. Welch

---

[7] Notably, to my knowledge, this is the first time that this Court has applied *Watkins* since it was decided in 2012.

[8] Because I dissent from Part II(B), I express no opinion on Part II(C), given that the premise of that section is that defendant's convictions for the 2017 charges stand.